950 F.2d 355
 57 Fair Empl.Prac.Cas. (BNA) 623,
57 Empl. Prac. Dec. P 41,100, 60 USLW 2394
 Micolette M. BRUNO, Plaintiff-Appellee,
v.
CITY OF CROWN POINT, INDIANA and George W. Pyle, Jr.,
individually and in his capacity as Chief of Crown
Point Emergency Medical Service,
Defendants-Appellants.
 No. 90-3164.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 30, 1991.
Decided Nov. 27, 1991.
Rehearing and Rehearing En Banc
Denied Jan. 31, 1992.
 
 Ivan E. Bodensteiner, argued, Valparaiso, Ind., for plaintiff-appellee.
 Elizabeth A. Knight, argued, Patrick J. Fanning, Knight, Hoppe, Fanning & Knight, Des Plaines, Ill., Michael K. Lulich, Modesto, Reynolds & McDermott, Chicago, Ill., for George W. Pyle, Jr.
 Elizabeth A. Knight, Patrick J. Fanning, Knight, Hoppe, Fanning & Knight, Des Plaines, Ill., Michael K. Lulich, Modesto, Reynolds & McDermott, Chicago, Ill., Timothy R. Sendak, Sendak, Sendak, Neff & Rominger, Crown Point, Ind., for City of Crown Point, Ind.
 Before COFFEY, EASTERBROOK, and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Paramedic applicant Micolette M. Bruno sued the City of Crown Point and George W. Pyle for sex discrimination under 42 U.S.C. § 1983 and 42 U.S.C. § 2000e, et seq. (Title VII) after Pyle hired a man, Thomas Walters, for an available paramedic position with the Crown Point Emergency Medical Services Department. In a trial before a magistrate judge, the jury awarded her $30,000 compensatory damages and no punitive damages. Pursuant to Title VII, the magistrate judge ordered Crown Point to hire her as a paramedic with full seniority and benefits from October 1987 and awarded her $30,000 in pretrial lost wages and $10,000 in post-trial lost wages. The magistrate judge also granted Bruno approximately $20,000 in attorneys' fees and costs. Crown Point and Pyle appeal alleging reversible error in an improper jury instruction, challenging the order requiring Crown Point to hire Bruno even if that means displacing a present paramedic and attacking the jury verdict as against the weight of the evidence. Because substantial evidence does not support the jury's conclusion that Bruno's sex was a determining factor in Pyle's decision to hire Walters and not Bruno, we reverse.
 
 I.
 
 2
 In August of 1987, Bruno was working full-time as a paramedic at Methodist Hospital in Crown Point, which included supervising and performing cardiovascular stress testing for the department of electrodiagnostics. Early in August, she stepped down from her supervisory position, which often required her to work 60-hour weeks, and returned to the 40-hour-per-week paramedic position she had been promoted from a year earlier. She testified that she resigned for "[p]ersonal reasons ... I wanted to spend more time with my family and my father who had just been diagnosed of terminal cancer." At the time, Bruno was the mother of a two-year-old son; her husband worked full-time as a paramedic for the Gary Fire Department.[1] Bruno also worked as an ambulance paramedic for the Town of Merrillville Emergency Medical Service from 1984 to 1987. She resigned that position in late 1987 after her hours were reduced from "almost full-time" to part-time.
 
 
 3
 Shortly after cutting back her duties at Methodist Hospital, Bruno, along with 12 others, applied for the open paramedic position at Crown Point. Bruno testified that she sought to return to working full-time on an ambulance, something her present job did not involve. She said she intended to continue working full-time at Methodist Hospital and hoped to gain regular overtime work for Crown Point if selected for that job.
 
 
 4
 During cross-examination, Pyle used a blackboard to demonstrate the type of weekly schedule Bruno would have faced had she been hired for the Crown Point position. Paramedics for Crown Point worked one 24-hour shift every three days. Thus, they worked seven shifts every three weeks, or an average of two and one-third 24-hour shifts per week (56 hours). Even without the part-time Merrillville position (from which she did resign later in the year), with the 40-hour-per-week position at the hospital, she would be working close to an average of 100 of the 168 hours in each week. Bruno testified that paramedics can rest during their 24-hour shifts when there are no calls and that many paramedics work two jobs.
 
 
 5
 Bruno filled out an application on August 24, 1987, in the company of two Crown Point paramedics with whom she was acquainted. She used one of them, Gary Gayle, as a personal reference on her application. Gayle testified that while filling out the application, Bruno said she would file a sex discrimination lawsuit against Crown Point if she did not get the job. Kathyleen Meyer, another friend of Bruno's, testified that Bruno said she was thinking about filing a "sex discrimination" claim because she had heard "something about a girl that had filed a Portage lawsuit and had won." Bruno admitted she talked with Gayle and Meyer about filing a sex discrimination lawsuit against Crown Point but claimed that she mentioned it only after her interview and after she heard rumors that she was not among the three finalists for the position.
 
 
 6
 Out of 13 applicants, Pyle selected Bruno and seven men for interviews.[2] Bruno met with Pyle for an interview on September 14, 1987. During the interview, Pyle asked Bruno a series of questions about her family circumstances. Bruno testified that Pyle asked her how many children she had and whether it was "time to have more children." He also asked about child care and how Bruno's husband would feel about her going back on 24-hour shifts. Bruno testified that she told Pyle she had discussed the paramedic position with her husband, she had a son, and her son was cared for by her mother-in-law who lived with them. Bruno also told Pyle that she was not planning on having any more children. Pyle's version of the interview was similar, except that he categorically denied ever suggesting that Bruno was about due for some more children. During the interview, Pyle wrote "No problem w/24/48 hr shifts" and "No problem w/child care" on Bruno's application.
 
 
 7
 In explaining his questioning of Bruno, Pyle testified that it was important for him to know about a prospective employee's child-care arrangements because he wanted the paramedics with children "to come to work knowing that their kids are taken care of" so they "can concentrate on doing their job and not have to worry about the safety and welfare of their children." Pyle further testified that he was particularly concerned with these family issues in Bruno's case because of her unique family circumstances. If Bruno was hired as a paramedic, both she and her husband would be working 24-hour shifts. "This could really work a hardship on the family. And depending on the way the scheduling is arranged, it's entirely possible that the kids might not see mom or dad maybe four waking hours every couple of days."
 
 
 8
 Pyle testified that he would have these concerns about an applicant's family whether the applicant was male or female. He testified that he asked all the applicants about their family status. Pyle's notations on the application of one male candidate included "Wife--LPN@ St. Anthony's" and "1 son." However, Pyle also testified that he did not recall asking any male applicant how his spouse felt about the 24-hour shifts or whether they expected to have children in the future. In earlier deposition testimony, Pyle had stated that he did not ask the male applicants these questions.
 
 
 9
 After interviewing all the applicants, Pyle discussed the applicants with the six paramedics in the Department; he wanted to know who the paramedics thought they could work with. He also put together a list of the qualified applicants, ranking them according to the number of years experience they had as paramedics. At the top of the list was Ron Reed, followed by Robert Mason and Bruno. Last on the qualified list, with about one year of experience as a paramedic, was 22-year-old Thomas Walters. Pyle selected Reed and Walters as finalists and had background checks made on them. During Reed's interview, Pyle had noted on his application that Reed had "good experience" but "may be too old--set in his ways."[3] Pyle's notes on Walter's application included, "Has very little experience as a paramedic. Could be more easily molded into our way of doing things."
 
 
 10
 Pyle ultimately hired Walters to fill the paramedic position. Pyle testified that there were several reasons Walters received the job: first, as with the other applicants interviewed, he met the minimum requirement of presently being a paramedic; second, in Pyle's subjective viewpoint, Walters carried himself well in the interview and seemed like he would fit in; third, Pyle thought Walters' newness to being a paramedic might be an advantage because they would be able to train him in "the Crown Point way of doing things"; and fourth, Walters received favorable comments from other paramedics on the Crown Point staff who worked well with Walters when he interned with the Crown Point emergency team.
 
 
 11
 At the close of evidence, on February 13, 1990, the magistrate judge issued his jury instructions. One instruction stated that Pyle and the mayor, who had ultimate decisionmaking authority for the City, were to be considered City policymakers for purposes of the § 1983 claim. The jury returned a $30,000 verdict against the defendants, but refused to award punitive damages. The magistrate judge entered judgment on June 2, 1990. In his order, the magistrate judge ruled that the § 1983 judgment was against Pyle alone and set aside the verdict against the City because Pyle was not a policymaker for the City. Pursuant to his Title VII injunctive powers, the magistrate judge ordered the City to instate Bruno as a paramedic with full benefits and seniority from October of 1987. The magistrate judge added $10,000 to the judgment to compensate Bruno for post-trial lost wages and awarded Bruno approximately $20,000 in attorneys' fees and costs. The magistrate judge then denied the defendants' post-trial motions but stayed the injunctive relief pending appeal.
 
 
 12
 Pyle and Crown Point appeal, alleging three errors. First, they argue that the jury instruction which wrongly stated that Pyle was a policymaker prejudiced Pyle and therefore was reversible error. Second, the City attacks the magistrate judge's decision to instate Bruno as a paramedic because the order might require Crown Point to fire an innocent incumbent employee. Third, the defendants argue that Bruno did not prove she was the victim of sex discrimination.II.
 
 
 13
 The defendants devote much attention to the first two issues--whether an instruction was defective and whether Bruno should displace Walters. However, because these issues have little merit, they can be addressed summarily.
 
 A. Jury Instruction
 
 14
 The defendants challenge the jury instruction that Pyle was an official "whose acts constituted official policy of the City of Crown Point." The magistrate judge, in granting the City's motion for a directed verdict, later found that Pyle was not a policymaker for the City. Thus, defendants argue, the instruction was erroneous. We will not reverse jury verdicts, however, "[e]ven if we should discern error in one or more instructions ... unless we are persuaded the jury's understanding of the issue was seriously affected, to the prejudice of the [complaining party]." Wilk v. American Medical Association, 719 F.2d 207, 218-19 (7th Cir.1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2398, 2399, 81 L.Ed.2d 355 (1984). It is difficult to construct a theory under which the erroneous instruction in this case could have prejudiced Pyle. According to the defendants, the instruction wrongly raised the possibility that Pyle's bad acts could be imputed to the City. They argue that this allowed the jury to "depersonalize" Pyle and potentially find Pyle liable for acts committed by the City. This reasoning is unpersuasive. The only acts that might be considered sexually discriminatory were committed by Pyle. Assuming the magistrate judge was ultimately correct in ruling that Pyle was not a policymaker, the only defendant that could be prejudiced by the instructional error was the City of Crown Point. Since the district court set aside the verdict against the City, that potential prejudice was cured.
 
 B. Instatement of Bruno
 
 15
 Next, the defendants challenge the magistrate judge's use of Title VII to order Bruno's instatement to the paramedic position. They contend the relief is extraordinary and improper because it would likely result in the bumping of an innocent, incumbent employee (namely Walters, who apparently was still a Crown Point paramedic at the time of trial, nearly three years after being hired). They argue this result is inequitable given the uncontroverted evidence that the City did not repeatedly discriminate against females and that such discrimination was not the official policy of the City. However, if the jury was correct in finding intentional discrimination against Bruno, the magistrate judge was clearly within his authority. Title VII grants federal courts the power to "order such affirmative actions as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g). The purpose of Title VII is "to make the victims of unlawful discrimination whole" by putting them in the "position where they would have been were it not for the unlawful discrimination." Albermarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (quoting the Committee Report on Title VII, 118 Cong.Rec. 7168 (1972)). Ordinarily, "slotting the victim in that position ... that would have been his had he been hired at the time of his application ... will be necessary to achieve the 'make-whole' purposes of the Act." Franks v. Bowman Transp. Co., Inc., 424 U.S. 747, 764-66, 96 S.Ct. 1251, 1264-65, 47 L.Ed.2d 444 (1976). This is true even where incumbents are bumped from their jobs because those incumbents would not have been hired if the discrimination had not occurred. What the Supreme Court has called ordinary relief, we will not call extraordinary.
 
 C. Evidence of Discrimination
 
 16
 That brings us to the defendants' final argument--that Bruno failed to prove she was the victim of intentional sex discrimination. The magistrate judge denied defendants' motion for judgment notwithstanding the verdict.[4] The magistrate judge's explanation of his decision to let the jury verdict stand was brief and provided little in the way of specifics. We review the magistrate's denial of a motion for judgment notwithstanding the verdict de novo. Aungst v. Westinghouse Electric Corp., 937 F.2d 1216, 1219 (7th Cir.1991). We determine whether the evidence is sufficient to support the verdict. Collins v. State of Illinois, 830 F.2d 692, 697 (7th Cir.1987). Although we take the evidence and all reasonable inferences from it in the light most favorable to Bruno, the evidence supporting the verdict must be substantial; a mere scintilla of evidence will not suffice. Aungst, 937 F.2d at 1219-20; Collins, 830 F.2d at 698-99.[5]
 
 
 17
 Under both Title VII and § 1983, the plaintiff is required to establish that she has been the victim of intentional discrimination. Friedel v. City of Madison, 832 F.2d 965, 971-72 (7th Cir.1987). The plaintiff can provide evidence of intentional discrimination in two different ways. The plaintiff may either offer direct proof of discrimination, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or may rely on indirect evidence using the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting method of proof. See King v. Bd. of Regents, Univ. of Wisconsin, 898 F.2d 533, 537 (7th Cir.1990); Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 568-69 (7th Cir.1989). Our examination of the record persuades us that substantial evidence does not support a finding of intentional discrimination under either evidentiary path.
 
 1. Direct Evidence
 
 18
 Under Price Waterhouse, the plaintiff has the initial burden of proving by direct evidence that an impermissible factor, in this case sex, played a motivating part in an employment decision. If the plaintiff proves that sex played a motivating part in an employment decision, "the defendant may avoid liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." Price Waterhouse, 490 U.S. at 258, 109 S.Ct. at 1795. See also McCarthy v. Kemper Life Ins. Co., 924 F.2d 683, 686 (7th Cir.1991); Randle, 876 F.2d at 568-69.
 
 
 19
 Bruno claims that the family-oriented questions she was asked in her interview for the paramedic position are "direct evidence" that sex played a motivating part in the defendants' decision not to hire her. Bruno testified that during her interview Pyle asked her how her husband would feel about her going back on 24-hour shifts, whether she was going to have more children and a question about child care for her son. Pyle denied asking Bruno about her plans for having more children and stated that he did not recall if he asked any of the male applicants about how their wives would feel or whether they expected to have more children. Pyle stated he did discuss family status with all the applicants. Bruno attempted to impeach Pyle's testimony with his deposition answers to similar questions. While this impeachment was dubious at best, when we view all this evidence in the light most favorable to Bruno, we conclude that the jury could have found that Pyle did not ask the male applicants how their spouses felt about working a 24-hour shift on an ambulance or whether they planned to have more children.
 
 
 20
 As Bruno's counsel acknowledged at oral argument and in his closing argument at trial, an employer may ask about a potential employee's family circumstances including questions about child care, spouse's employment and potential conflicts with job and family. An employer is not required to ignore an applicant's family and family responsibilities. Such questions are appropriate and in some circumstances probably necessary. This of course assumes that the questions are asked in a neutral, nondiscriminatory manner of all applicants. While family questions are important, an interviewer should not single out women and focus on them as if they were the only sex concerned about how family responsibilities may affect the demands of the job.
 
 
 21
 Here, the jury could believe Pyle asked only Bruno about her husband's opinion of her taking the job. True, Bruno's husband apparently was the only spouse Pyle knew to be involved in his own 24-on/48-off shift. Nevertheless, if that issue was important to the job, he probably should have asked all the applicants this question. The question or comment about having more children appears inappropriate in these circumstances and probably irrelevant. To the latter question Bruno inevitably answered "No." With a question that personal--whether to a male or female--the interviewee has to assume that the employer wants to hear a negative answer, so the "No" answer does not eliminate the problem.
 
 
 22
 The fact that Pyle asked only Bruno family-oriented questions reveals that those questions were based on sex stereotypes--namely, that females are the primary care providers for children and that the wife's career is secondary to the husband's. Merely showing the questions were asked, however, is not sufficient to prove intentional discrimination. Questions "based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision." Price Waterhouse, 490 U.S. at 251, 109 S.Ct. at 1791. Bruno "must show that the employer actually relied on her gender in making its decision." Id.
 
 
 23
 Thus, we must determine whether there is substantial evidence that Pyle relied on the sex stereotyped questions in making his decision to hire Walters. Pyle stated he questioned Bruno about her family because he was concerned about possible time conflicts with both Bruno and her husband working 24/48-hour shifts, Bruno working a second full-time job at Methodist Hospital, and a two-year-old son at home. Pyle himself testified that from his personal experience he knew of the strains and demands of child care when both parents work full-time (not to mention when one parent also works a second full-time job). There is no evidence that any other applicant was faced with this unique and demanding situation. Further, Pyle testified that he would be concerned about the family circumstances of any applicant, male or female, in Bruno's situation. In any event, Bruno's answers appear to have reassured Pyle; at least, there is nothing in the record to suggest otherwise. Bruno testified that she told Pyle that at the time her mother-in-law lived with her and her family. In effect, she had around-the-clock child care. Thus, what would seem to be an obvious and necessary question is resolved with that answer. The only notes Pyle made on Bruno's application during the interview said "No problem w/24/48 hr shifts" and "No problem w/child care." The notations could be evidence that Pyle concluded Bruno's family circumstances would not affect her ability to work for Crown Point; or perhaps he was merely noting that she thought two full-time jobs would not cause family or child-care problems. Neither inference implies that Pyle concluded Bruno's sex rendered her ineligible for the job. The evidence in the record does not establish that Pyle relied on sex stereotypes.[6]
 
 2. Indirect Evidence
 
 24
 Although there was no direct evidence of sex discrimination, Bruno may also establish intentional discrimination through the burden-shifting method of proof outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981). The McDonnell Douglas/ Burdine structure is well-known:
 
 
 25
 First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
 
 
 26
 Burdine, 450 U.S. at 252-53, 101 S.Ct. at 1093 (quoting McDonnell Douglas, 411 U.S. at 802-04, 93 S.Ct. at 1824-25) (citations omitted). To establish a prima facie case under the McDonnell/ Burdine analysis, Bruno need only prove "that she applied for an available position for which she was qualified, but was rejected under circumstances that give rise to an inference of unlawful discrimination." Id. at 253, 101 S.Ct. at 1093. The burden of production that shifts to the defendants when Bruno establishes her prima facie case is merely to clearly set forth, through admissible evidence, a legitimate, nondiscriminatory reason for Bruno's rejection. The defendants "need not persuade the court that it was actually motivated by the proffered reasons." Id. at 254-55, 101 S.Ct. at 1094. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 253, 101 S.Ct. at 1094.
 
 
 27
 Bruno established a prima facie case by showing that she was in a protected class, that she applied for the position of paramedic for which she was qualified, and that a person not in the protected class, Thomas Walters, was hired. This shifted the burden of production to Pyle to articulate a legitimate, nondiscriminatory reason for his failure to hire Bruno.
 
 
 28
 Pyle articulated several legitimate, nondiscriminatory reasons for hiring Walters. Pyle testified that he chose Walters because he had the least experience (about a year) and therefore could be molded in the Crown Point way of doing things. Walters also had undergone some training as a paramedic student with the Crown Point emergency team; he therefore had the advantage of being known to Pyle and the other paramedics who apparently had a favorable impression of his work. Finally, Walters scored well on Pyle's subjective list of qualities, such as personality; in the vernacular, Walters and Pyle "clicked" during their interview.
 
 
 29
 After Pyle articulated these nondiscriminatory reasons, Bruno had the burden to prove they were mere pretext. This she failed to do. The evidence supporting Pyle's articulated reasons for hiring Walters includes the fact that Pyle was the first and only director of the Crown Point Emergency Medical Services Department. The Department was very small, consisting of Pyle and six other paramedics. Other than patient care standards, Pyle controlled employee procedures in the Department and had a "Crown Point way of doing things." Thus, it was logical for Pyle to want employees that could be molded into the Crown Point way of doing things and would be able to fit in with the existing paramedic team. Further support for Pyle's contention that he was concerned with the Crown Point way of doing things is his notation on Walters' application that he "[c]ould be molded into our way of doing things" and the notation on the application of the oldest (37 years old) and most experienced applicant, Reed, that he "may be too old, set in his ways." Pyle obviously had a trained team in place and wanted the new person to fit in, rather than employing procedures learned elsewhere.
 
 
 30
 Bruno presented no evidence to rebut Pyle's articulated reasons for hiring Walters other than to attack the wisdom of hiring the applicant with the least experience. Neither § 1983 nor Title VII, however, was intended to limit the traditional hiring and firing prerogatives of employers; it was intended to prohibit deliberate discrimination. Burdine, 450 U.S. at 259, 101 S.Ct. at 1096. An employer's decision does not have to be wise, prudent or logical; it merely has to be explained clearly and applied indiscriminately. Burdine, 450 U.S. at 259, 260, 101 S.Ct. at 1096, 1097. "If you honestly explain the reasons behind your decision, but the decision was ill-informed or ill-considered, your explanation is not a pretext." Pollard v. REA Magnet Wire Co., Inc., 824 F.2d 557, 559 (7th Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). See also Friedel v. City of Madison, 832 F.2d 965, 973 (7th Cir.1987) ("Neither sections 1981 and 1983 nor Title VII makes an employer liable for simply erroneous or arbitrary decisions."); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").
 
 
 31
 Pyle's decision to go with the least experienced, qualified paramedic prejudiced equally the other more experienced male paramedics; it was a gender-neutral consideration. The uncontroverted evidence showed that Pyle ranked a male applicant, Ron Reed, as the most experienced paramedic and another male candidate had at least as much experience as Bruno. Even if Pyle had hired the most experienced paramedic, according to objective standards, Bruno would not have been the choice. Bruno argues that the jury could have believed she was as qualified as Reed or any other paramedic. We disagree; there is no evidence that Pyle considered her to be as experienced as Reed, and an objective examination of their resumes does not support her contention.
 
 
 32
 In order to reach a verdict of intentional discrimination, the jury had to conclude Pyle's reasons for hiring Walters were a pretext. Bruno's attorney admitted at oral argument that, in order to accept Bruno's argument of pretext, the jury had to conclude that Pyle's effort to discriminate against Bruno was so well-thought-out that he hired the least experienced male paramedic over six more experienced men, all so he could concoct the pretextual argument that he wanted to mold his new paramedic into the Crown Point way of doing things. The jury would also have had to conclude that, during the interviews, Pyle wrote the notations on Reed's application and Walter's application solely in an attempt to cover-up his discrimination against Bruno. These theories are too far-fetched and simply implausible given the evidence in this case. See, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it"). It is much more likely that Pyle actually saw Walters' relative inexperience as a potential advantage for easily accepting and blending in with an established team; this, combined with Walters' previous favorable experience with Crown Point as a paramedic student and his compatible encounter with Pyle during the interview, meant that Walters was offered the job. Whether Pyle's decision was the right one for the best delivery of paramedic services to Crown Point is not for us to decide. Whatever the wisdom of choosing Walters over seven more experienced paramedics (six male, one female), the evidence does not support the conclusion that sex was a determining factor in the hiring decision.
 
 III.
 
 33
 An employer may ask applicants questions regarding family circumstances including questions about child care, spouse's employment and supportiveness, and potential conflicts with job and family. However, the questions should be asked of all applicants, regardless of sex, who appear to present family circumstances that might impact their ability to do certain jobs. The fact that family-oriented questions are asked only of female applicants, however, is not in itself sufficient evidence to support a finding of intentional sex discrimination. The plaintiff still must prove that the employer based his decision on the sex stereotypes implicit in such questions when directed only to women. Since there is no other evidence to support a finding of intentional sex discrimination and since Bruno's theory that Pyle's reasons for hiring Walters were pretext is implausible, the judgment is REVERSED and remanded with instructions that judgment be entered for the defendant.
 
 
 34
 EASTERBROOK, Circuit Judge, dissenting.
 
 
 35
 Pyle asked Bruno how her husband felt about her applying for the job and whether she planned to have additional children. These paternalistic questions, asked only of women, show that he thought about men and women differently and allowed the jury to infer that he believes a woman's place is in the home. Did this belief work to Bruno's disadvantage? We know that Pyle has never hired a female paramedic. That the City has built women's restrooms hardly compels the jury to infer that Pyle treats women and men as equals.
 
 
 36
 Pyle's explanation for giving Walters the position Bruno sought is that Walters had the least experience of any qualified applicant and therefore "[c]ould be more easily molded into our way of doing things." By contrast Reed, who was first on Pyle's initial list, "may be too old--set in his ways." A jury could think this an honest explanation. If honest, it defeats Bruno's claim because it is unrelated to sex. Cf. Visser v. Packer Engineering Associates, Inc., 924 F.2d 655 (7th Cir.1991) (in banc); Pollard v. Rea Magnet Wire Co., 824 F.2d 557 (7th Cir.1987). A jury also could find this explanation fabricated, a pretext--age discrimination on top of sex discrimination. When asked just what the "Crown Point way of doing things" is, Pyle had no answer. He conceded that the paramedics operate under the direction of a local hospital. If "our way of doing things" is no different from anyone else's (did Crown Point really have a municipal way of restarting a heart or dressing a wound?), then this "explanation" is just an effort to blow smoke in the jurors' eyes. It failed. It was not doomed to fail, but it did, and its very failure adds to the lists of inferences against Pyle. Benzies v. Illinois Department of Mental Health and Developmental Disabilities, 810 F.2d 146, 148 (7th Cir.1987). If the employer is trying to hide its real reason, that effort--coupled with the evidence making up the employee's case--may convince the trier of fact that the real reason needed to be hidden because it was discriminatory. See also Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254-56, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981).
 
 
 37
 My colleagues make some solid points in favor of Pyle and the City. A verdict in their favor could not be disturbed. When the inferences cut both ways, the trier of fact is entitled to decide. Both the jury evaluating the § 1983 claim and the judge assessing the Title VII claim accepted the inferences in Bruno's favor. We should affirm the judgment.
 
 
 
 [1]
 Bruno and her husband subsequently divorced, and Bruno remarried on the Friday before this case went to trial
 
 
 [2]
 Of the five who were not qualified and did not make the first cut, four were male and one was female
 
 
 [3]
 This statement taken out of context in an age discrimination case could cause concern. As it is, Reed is not a party to this case nor was he in the age group protected by the Age Discrimination in Employment Act (ADEA)
 
 
 [4]
 Although Pyle moved for judgment notwithstanding the verdict, and in the alternative for a new trial, the magistrate judge treated the motion as one for a new trial only. (See August 29, 1990 opinion at 2-3.)
 
 
 [5]
 Defendants challenge the judgment on both the § 1983 claim and the Title VII claim. The § 1983 claim was tried to a jury, and the Title VII claim was simultaneously tried to the judge. Normally in a bench trial, the judge makes specific findings of fact and conclusions of law that are reviewed under the "clearly erroneous" standard. Fed.R.Civ.P. 52(a). However, when, as in this case, a "legal" § 1983 claim and an "equitable" Title VII claim are tried together, the jury's verdict binds the judge and he is not required to make separate factual findings. McKnight v. General Motors Corp., 908 F.2d 104, 113 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991); Williamson v. Handy Button Machine Co., 817 F.2d 1290, 1293-94 (7th Cir.1987). The magistrate judge in this case did not make independent factual findings. In such cases, the court's judgment on the Title VII claim has the same fate as the jury's verdict in the § 1983 claim, reviewed under the directed verdict/JNOV, sufficiency of the evidence standard. See King v. Board of Regents, Univ. of Wisconsin, 898 F.2d 533, 538 (7th Cir.1990)
 
 
 [6]
 Bruno also contends that Pyle's reference in her interview to the lack of female bathroom facilities is direct evidence of sex discrimination. This argument has no substance; according to Bruno's own testimony, Pyle merely pointed out that the new facilities being built would include a bathroom for women. There is no bias in such a statement, but of course, Pyle would have no reason to mention it to the male applicants. Bruno also keeps reminding us that Crown Point has never hired a female paramedic or emergency medical technician. Yet the uncontradicted evidence showed that Pyle and Crown Point Emergency Services employed women in other capacities and, more importantly, that Bruno was the first qualified female to ever apply for an open paramedic position and she was given serious consideration and an interview. If anything, the new facility then under construction was evidence that the department anticipated hiring women