Kathleen A. KARIOTIS, individually and as best friend of Peter Kariotis, a minor, and Angelo Kariotis, Plaintiffs,

v.

NAVISTAR INTERNATIONAL TRANSPORTATION CORP., Defendant.

No. 95 C 6821.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 28, 1997.

---

William L. Barr, Jr., Gregory J. Schroedter, James P. Tutaj, Micaela M. Daly, Bell, Boyd & Lloyd, Chicago, IL, for Plaintiffs.

David J. Parsons, Richard Lawrence Creech, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This matter is before the Court on cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed hereafter, Defendant's motion is granted in part and denied in part; Plaintiffs' motion is denied.

### I. BACKGROUND

Plaintiff Kathleen Kariotis had been employed with Defendant Navistar International Transportation Corporation ("Navistar")

(and its predecessor International Harvester) since 1984. Kariotis began her employment as a secretary and eventually became an executive assistant.

On March 21, 1995, Kariotis commenced disability leave so that she could undergo and recuperate from a knee replacement operation. At that time, Kariotis' treating physician, E. Thomas Marquardt, indicated that Kariotis would be able to return to work on approximately June 1, 1995. On May, 18, 1995, Kariotis' return to work date was extended to June 19, 1995. On June 12, 1995, Kariotis' return to work date was extended to June 27, 1995. On June 26, 1995, Kariotis' return to work date was extended to July 11, 1995.

During the prior year, an unsigned letter received by Navistar management accused Kariotis of unethical behavior. An investigation ensued. Although irregularities remained unresolved, no conclusive evidence to substantiate the accusations in the letter was discovered.

Suspicious of the claimed severity of Kariotis' injury, William Vlcek—manager of human resources—discussed the situation with his superior, Robert Goldie—director of business and people processes. Consequently, Goldie and Vlcek decided to pursue undercover surveillance of Kariotis. Navistar hired In Photo Surveillance to conduct the undercover surveillance of Kariotis.

In Photo Surveillance conducted an undercover videotaped surveillance of Kariotis on June 17 and 20, 1995. A report summarizes the surveillance as follows:

> We have ... obtained videotape of your subject walking, driving a vehicle, getting into a vehicle, getting into and out of a golf cart, sweeping, and pushing a grocery cart. We note that the stride in one leg did not appear to be the same as the stride in the other.
>
> Apart from this, however, she does not appear to be physically handicapped or disabled, nor does she wear any visible brace or cast. We note that she does not utilize the support of a cane while moving about.

In Photo Surveillance conducted further surveillance on June 26, 1995. That report summarized the surveillance as follows:

> We ... have obtained approximately 17 minutes of videotape of your subject walking, driving, entering and exiting a vehicle, sitting and bending. We note that the stride in one leg did not appear to be the same as the stride in the other. Apart from this however, she does not appear to be physically handicapped or disabled, nor does she wear any visible brace or cast. We note that she does not utilize the support of a cane while moving about.

On June 30, 1995, Kariotis met with Vlcek at Navistar's offices. Kariotis was unaware of the undercover surveillance. Vlcek's notes indicate that Kariotis stated that before her second knee manipulation on June 28, 1995, she could not shop, grocery shop, or walk straight. Kariotis disputes Vlcek's notes—she claims that she never said such things.

On the same day, following the meeting between Vlcek and Kariotis, several Navistar management personnel—including Goldie and Vlcek—met to discuss Kariotis' situation. A videotape was played at the meeting.

On July 6, 1995, Kariotis was terminated. The termination letter indicates that Kariotis was terminated for cause, which includes, but may not be limited to, fraud, *i.e.*, claiming disability benefits for which she was not eligible since June 17, 1995.

Kariotis filed a complaint in this Court alleging violations of the Americans With Disabilities Act ("ADA") 42 U.S.C. § 12101, *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*; the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161, *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; and the Illinois Health Insurance Claim Filing Act, 820 ILCS 45. Additionally, the complaint contains a claim for negligent infliction of emotional distress.

This matter is now before the Court on cross-motions for summary judgment.

## II. SUMMARY JUDGMENT— STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

## III. DISCUSSION

As noted, Kariotis' complaint alleges that Navistar's conduct violated the ADA, the ADEA, the ERISA, the COBRA, the FMLA, and the Illinois Health Insurance Claim Filing Act. She also advances a claim for negligent infliction of emotional distress. Navistar seeks summary judgment on all claims. Kariotis seeks summary judgment on the COBRA and the FMLA claims. The Court will address the ADA, the ADEA, and the ERISA claims first and the remaining claims in turn.

### A. The ADA, the ADEA, and the ERISA

Kariotis, admittedly, has no direct evidence that unlawful discrimination of any form played a role in Navistar's decision to terminate her. Accordingly, she proceeds under the indirect method of proof or three-step model enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to establish her claim of discrimination under the ADA, the ADEA, and/or the ERISA at the summary judgment stage. *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995) (*McDonnell Douglas* test used in ADA case); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993) (*McDonnell Douglas* test used in ADEA case); *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir.1996) (*McDonnell Douglas* test used in ERISA case).

First, Kariotis must establish a *prima facie* case. She must show: (1) that she belongs to a protected group; (2) that she performed satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that similarly situated employees outside the classification received more favorable treatment. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994). Navistar does not argue that Kariotis cannot establish a *prima facie* case under either the ADA, the ADEA, or the ERISA; accordingly, Kariotis passes the first step.

Once established, the "*prima facie* case creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir.1996). "If the employer meets its burden of production, the presumption dissolves." *Id.*

■ Navistar meets its burden of production at step two—it claims that it terminated Kariotis because it believed that she was committing disability fraud. As discussed, Navistar, suspicious of the recovery period associated with Kariotis' injury, decided to pursue undercover surveillance. In Navistar's opinion, the undercover videotape was inconsistent with Kariotis' injury. Thus, it believed that she was committing disability fraud and had her terminated. Accordingly, the presumption of discrimination under the

ADA, the ADEA, and the ERISA dissolves.[1]

If the presumption dissolves, "[t]o prevail, the employee then must demonstrate that the nondiscriminatory explanation of the employer is pretextual." *Id.* Pretext means a lie. *Id.* There are three ways to show that a proffered nondiscriminatory explanation is pretextual: (1) the employer's explanation had no basis in fact; (2) the explanation was not the "real" reason; or (3) the reason stated was insufficient to warrant the adverse employment action. *Id.* "In trying to establish that an employer's explanation is pretextual, an employee must 'focus on the specific reasons advanced by the defendant[s].' " *Id.*

■ Kariotis relies on the second way to show that Navistar's proffered nondiscriminatory reason is a lie—she claims that the explanation was not the real reason. The real reason for her termination, according to Kariotis, was discrimination in violation of the ADA, the ADEA, and/or the ERISA. In support of her position that Navistar lied when it claimed that it fired her because it believed that she was committing disability fraud, Kariotis notes that: (1) Navistar could have showed the videotape to her doctor and asked for his opinion as to whether the tape was inconsistent with her complaints; (2) Navistar could have had its company doctor look at Kariotis and provide an opinion as to whether she was able to return to work;[2] (3) Navistar did not follow its appeal process regarding her termination; and (4) Navistar, after it terminated Kariotis, ignored her doc-

tor's opinion that she did not commit disability fraud.[3]

In the Court's opinion, the four reasons offered by Kariotis are insufficient to raise the inference that Navistar's legitimate, nondiscriminatory reason—disability fraud—for firing her is a lie. It is critical to note that at this stage of the analysis, the Court is *not* concerned with whether the employer's decision was wise, logical, prudent, ill-informed, ill-considered, or accurate. Indeed, the Court's only concern is whether the decision was honest, *i.e.*, whether the employer believed the proffered reason for the decision. *See Helland v. South Bend Community Sch. Corp.*, 93 F.3d 327, 330 (7th Cir.1996); *Bruno v. City of Crown Point, Ind.*, 950 F.2d 355, 364 (7th Cir.1991), *cert. denied,* 505 U.S. 1207, 112 S.Ct. 2998, 120 L.Ed.2d 874 (1992). The four reasons proffered by Kariotis in support of her position that Navistar lied arguably create issues of fact as to whether Navistar's employment decision was prudent, ill-informed, and accurate, but the Court does not believe that they are enough to call into question the honesty of the decision.

The first two reasons—Navistar's failure to show the videotape to her doctor and failure to have her examined by a company doctor—question whether Navistar acted carelessly or made the most informed decision. But, in Navistar's opinion, the videotape spoke for itself. Thus, why waste the time of showing the videotape to Kariotis' doctor and/or have a company doctor examine her?

---

1. Kariotis argues that Navistar has not offered a legitimate nondiscriminatory reason for her termination. Kariotis claims that because Navistar terminated her without an examination by its staff doctor or consulting with her doctor, it cannot claim that it acted "legitimately."
   It appears to the Court that Kariotis has not properly framed the issue. At the second step of the *McDonnell Douglas* test, Navistar merely has to offer a nondiscriminatory reason for its decision, *i.e.*, a lawful reason supporting its conduct. Terminating an employee for disability fraud is such a reason. The fact that Kariotis is displeased with the way Navistar went about its chosen course of action does not mean that the reason is not legitimate and nondiscriminatory.

2. Kariotis states that Navistar's FMLA policy *"required"* it to obtain a second opinion by a Navistar doctor when an employee's disability status

was in question. Kariotis submits the policy and cites the deposition testimony of John Sheahin—senior vice president of employee relations and administration—in support. Neither the deposition testimony nor the plain-language of the FMLA policy supports such a statement. Indeed, the policy states that the company *"has the right to ask for a second opinion,"* not that it is *"required "* to. Moreover, the cited deposition testimony does not even concern the issue.

3. On July 12, 1995—six days after Kariotis was terminated—Kariotis' doctor wrote a letter to Goldie claiming that Navistar's position that Kariotis had committed disability fraud was "inaccurate" and "preposterous."

Following the termination decision, Navistar did not allow Kariotis to formally appeal the decision and it ignored her doctor's opinion—reasons number three and four. But, once again, in Navistar's opinion, the videotape spoke for itself. Thus, an appeal within the company would have been futile. Moreover, in Navistar's opinion, Kariotis was deceiving her doctor, thus, why should it put any credence in his opinion post-termination when he was being mislead pre-termination?

In summary, the Court does not believe that Kariotis has come forward with enough evidence to cast doubt on the honesty of Navistar's proffered legitimate, nondiscriminatory reason for terminating her. Once again, the evidence submitted by Kariotis shows that perhaps Navistar acted carelessly or that its conclusion that she defrauded it was inaccurate,[4] but, in the Court's opinion, the evidence is insufficient to show that Navistar did not believe its proffered legitimate, nondiscriminatory reason. Accordingly, Navistar is granted summary judgment on the ADA, the ADEA, and the ERISA claims.

### B. The COBRA

Pursuant to 29 U.S.C. § 1161(a):

The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

Simply stated, if an employee's termination is the result of a "qualifying event," the employee—and any other "qualified beneficiary"—is entitled to notice of the right to continue medical insurance.

A "qualifying event" is defined in § 1163. For purposes of the instant dispute, the Court is concerned with only subsection (2). Under § 1163(2), the employee's termination is a "qualifying event" unless the termination

is due to the employee's "gross misconduct." Thus, unless the employee was terminated for "gross misconduct," the employee is entitled to notice of his right to continue medical insurance coverage. If notice is not given, the employer of course violates the COBRA.

■ Kariotis argues that Navistar violated the COBRA because it never gave her—and the other qualified beneficiaries—notice of their right to continue the medical insurance. Navistar responds that it fired her because she committed disability fraud and such conduct constitutes "gross misconduct;"[5] thus, pursuant to § 1163(2), her termination was not a "qualifying event," consequently, it was not required under § 1161(a) to give notice. Kariotis replies that Navistar has not come forward with any evidence that she *actually* committed disability fraud;" rather, Navistar's evidence, at most, shows only that Navistar *"believed"* that she committed disability fraud.

The parties' positions raise an interesting issue, one which has not been addressed by many courts yet: For an employer to refrain from giving COBRA notice by relying on § 1163(2), must the employee *actually* engage in "gross misconduct" or is it enough that the employer has a good-faith belief that the employee engaged in "gross misconduct?"

■ The Court concludes that the latter approach should govern its analysis—*i.e.,* whether Navistar, at the time of termination,[6] had a good faith belief that Kariotis engaged in "gross misconduct." As noted recently *in dicta* by the Seventh Circuit, such an approach has "a certain resonance with both traditional and modern concepts of employment law, particularly discriminatory discharge law." *Mlsna v. Unitel Communications, Inc.,* 91 F.3d 876, 883 (7th Cir.1996); *see, Conery v. Bath Assoc.,* 803 F.Supp. 1388, 1396 (N.D.Ind.1992) ("Bath responds that the

---

**4.** As stressed by the Seventh Circuit, no federal law "requires just cause for discharges." *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 558 (7th Cir.1987), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

**5.** Kariotis concedes that disability fraud qualifies as "gross misconduct" for purposes of § 1163(2).

**6.** *See, Burke v. Am. Stores Employee Benefit Plan,* 818 F.Supp. 1131, 1137 (N.D.Ill.1993) ("[T]he inquiry into the propriety of an employer's determination should be limited to the evidence which was available to the employer at the time of the employee's termination.").

appropriate inquiry should be whether the employer acted on a good faith belief that the employee engaged in gross misconduct. The court leans toward the test proposed by Bath...."").

Thus, consistent with discriminatory discharge law, the Court's analysis is whether Navistar had a good faith belief at the time of termination that Kariotis committed disability fraud—if so, Kariotis was not entitled to notice under the COBRA. As discussed while analyzing Kariotis' discriminatory discharge claims, Navistar, based on the videotape, believed that Kariotis was committing disability fraud. Consistent with the analysis there, the Court does not believe that Kariotis has come forward with enough evidence to cast doubt on the truthfulness of Navistar's belief. Accordingly, the Court must conclude that Navistar acted with good faith when it terminated Kariotis. Therefore, she was not entitled to notice under the COBRA.

## C. *The FMLA*

■ At the time Kariotis was terminated, she asserts that she had twelve weeks of FMLA leave remaining. Because she was not restored to her former position following the expiration of the twelfth week, Kariotis claims that Navistar violated the FMLA.

The Court cannot agree with Kariotis' analysis. The reason Kariotis was not restored to her former position, *obviously,* was because she was terminated based on Navistar's belief that she committed disability fraud. Thus, why would Navistar be obligated under the FMLA to restore an employee terminated for disability fraud to her former or a comparable position? Kariotis' position warrants no further discussion.

## D. *The Illinois Health Insurance Claim Filing Act*

■ Similar to her ERISA claim, Kariotis alleges that she may have been terminated for receiving medical and disability benefits from Navistar's health insurance plan. Kariotis argues that such conduct violate & the Illinois Health Insurance Claim Filing Act.

Assuming this claim is not preempted by the ERISA,[7] *see Wagenknecht v. Wal–Mart Stores, Inc.,* No. 95 C 50243, 1995 WL 617479 (N.D.Ill. October 13, 1995) (retaliatory discharge claim under the Illinois Health Insurance Claim Filing Act preempted by § 510 of the ERISA), the Court concludes that it would be analyzed in a manner similar to Kariotis' ADA, ADEA, and ERISA claims— *i.e.,* by employing the *McDonnell Douglas* burden shifting test. As discussed when analyzing the ADA, ADEA, and ERISA claims, Kariotis' has not come forward with enough evidence to support her allegations. Accordingly, the instant claim also fails under a similar analysis.

## E. *Negligent Infliction of Emotional Distress*

In Navistar's motion for summary judgment, it presented *one* argument as to why it was entitled to summary judgment on Kariotis' negligent infliction of emotional distress claim: it argued that Kariotis could not recover under Illinois law due to the application of the "impact rule." The "impact rule" says that one cannot recover for negligent infliction of emotional distress unless such distress was "accompanied by a contemporaneously physical *injury* to or *impact* on the plaintiff." *Kapoulas v. Williams Ins. Agency, Inc.,* 11 F.3d 1380, 1382 (7th Cir.1993).

In response, Kariotis noted that Illinois law was changed recently. The new law now permits recovery without the need to show a contemporaneous physical injury. *See Pasquale v. Speed Products Engineering,* 166 Ill.2d 337, 211 Ill.Dec. 314, 654 N.E.2d 1365 (1995).

In reply, Navistar, conceded its error and agreed that the "impact rule" is no longer applicable.

Nevertheless, Navistar, in its reply brief, asserted that Kariotis could not recover because her response failed to discuss the elements necessary to maintain a negligent infliction of emotional distress action. It is Navistar, however, who was obligated to discuss the elements, not Kariotis. This issue is before the Court on *Navistar's* motion for

7. Neither party has addressed the ERISA preemption issue.

summary judgment, not Kariotis' motion. Thus, as part of its motion for summary judgment, Navistar was required to analyze the viability of the claim. That, Navistar failed to do. Accordingly, Navistar is not entitled to summary judgment.[8]

Since, as a result of the Court's analysis, there are no longer any federal causes of action remaining in this matter, however, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state law negligent infliction of emotional distress claim. Accordingly, the claim is dismissed.

## IV. CONCLUSION

Navistar's motion for summary judgment is granted in part and denied in part. It is granted with respect to all claims but the negligent infliction of emotional distress claim. Kariotis' motion for summary judgment is denied. Kariotis' negligent infliction of emotional distress claim is dismissed.

8. It should be noted that the negligent infliction of emotional distress claim may likely be preempted by the Illinois Human Rights Act ("IHRA"). Several judges in this district have held that if the state tort claim is "inextricably linked" to the underlying discrimination claim, the claim falls within the exclusive jurisdiction of the Illinois Human Rights Commission and thus is preempted by the IHRA. For a discussion of this issue, *see Daulo v. Commonwealth Edison,* 938 F.Supp. 1388, 1404–05 (N.D.Ill.1996).