972 F.2d 351
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Jerome HUNT, Plaintiff-Appellee,
v.
CHICAGO HOUSING AUTHORITY, a municipal corporation, James
Gilmartin and Charles Clarke, Defendants-Appellants.
 No. 90-3614.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 12, 1991.
Decided Aug. 19, 1992.
Rehearing and Rehearing En Banc
Denied Sept. 14, 1992.
 
 Before POSNER, RIPPLE and MANION, Circuit Judges.
 
 ORDER
 
 1
 Jerome Hunt, an employee of the Chicago Housing Authority (the CHA), was a vigorous critic of waste and mismanagement in the CHA's elevator maintenance. He was discharged, and brought suit under 42 U.S.C. § 1983 against the CHA, James Gilmartin, and Charles Clarke,[1] alleging that, in firing him, the CHA and the individual defendants had violated his First Amendment right to free speech and his Fourteenth Amendment rights to procedural and substantive due process. He also asserted state law claims of breach of contract and retaliatory discharge. A jury found in his favor on the constitutional claims, and the defendants appeal. For the reasons set forth in this order, we affirm in part and reverse in part the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Jerome Hunt has lived in CHA housing since 1966. He frequently and loudly made his views known on the inadequacy of elevator maintenance in CHA housing. Beginning in 1975, Mr. Hunt attended meetings of the CHA's Board of Commissioners (the Board) almost every month and voiced criticisms of the CHA's program of elevator maintenance. In October 1980, the CHA hired Mr. Hunt as a "resident elevator representative," a newly-created position. Mr. Hunt's duties were to
 
 
 4
 1. Serve as a member of the CHA Elevator Committee.
 
 
 5
 2. Present to the Committee the views of residents concerning elevator operational problems.
 
 
 6
 3. Inform residents of actions and/or proposed actions of the Elevator Committee.
 
 
 7
 4. Maintain close liaison with the Local Advisory Councils and Building Councils, by personal visits, so as to be fully informed regarding elevator service.
 
 
 8
 5. Assist in formulating a general plan for improvement of elevator conditions and service.
 
 
 9
 6. Perform related duties as assigned.
 
 
 10
 Plaintiff's Ex. 3. Mr. Hunt worked at putting into order the work tickets and invoices submitted by the elevator repairmen, kept a record of elevators out of service, wrote numerous reports, and as his job description indicates, served as a member of the Elevator Committee. After the Elevator Committee was disbanded in 1981, Mr. Hunt continued to file reports and to attend the public CHA Board meetings. Apparently Mr. Hunt attended some of these meetings on his own time as a private citizen. He continued to voice his criticisms there: many elevators were out of order on any given day; the repair budget was not well spent; needed parts were unavailable; he believed that repairmen employed by Westinghouse, the company under contract to maintain the elevators, sabotaged the elevators and charged for work that was never done.[2]
 
 
 11
 At the meetings, on more than one occasion, Charles Swibel, the chairman of the Board, expressed displeasure at Mr. Hunt's voicing his criticisms in public rather than going through the "chain of command" within the agency. At one meeting, Andrew Mooney, who was then the Executive Director and later replaced Swibel as chairman, told Mr. Hunt: "Mr. Hunt, I would prefer if you did not yell at the board, whether you are here as a private citizen or as an employee of this Authority.... I finally have gotten tired of you talking to this board this way." Another meeting, at which Mr. Hunt was vociferously critical, was also attended by Winston Moore, the CHA's director of security, and James Simpson, the CHA's director of maintenance. According to Mr. Hunt, Winston Moore, the CHA's director of security, sat behind Mr. Hunt, told Mr. Hunt he was not supposed to attend the meetings, repeatedly interrupted him and directed Mr. Hunt's attention to Simpson. When Simpson saw Mr. Hunt after the meeting, Simpson, who was not Mr. Hunt's immediate supervisor, told Mr. Hunt to sign out and go home. Mr. Hunt refused and also refused to give Mr. Simpson a description of his job assignments for the rest of the day. When Simpson later told defendant Charles Clarke, who was Mr. Hunt's supervisor and had also been present at the meeting, that Mr. Hunt had been insubordinate, Clarke placed Mr. Hunt on probation. This was the first time that Mr. Clarke disciplined Mr. Hunt. While on probation, Mr. Hunt performed his job in a satisfactory manner, and February 2, 1982, Mr. Clarke gave Mr. Hunt a satisfactory evaluation and recommended that he be taken off probation.
 
 
 12
 On December 20, 1982, the Board held an executive session. One of the topics discussed was the job description of the "CHA resident elevator representative." After some discussion, Commissioner Leon D. Finney stated, "I have a problem seeing why [Mr. Hunt] would come to a meeting and publicly vent his frustration" and then,
 
 
 13
 I don't think this board ought to get involved in termination or hiring. That is my own judgment. That is why I am having a problem with this individual.
 
 
 14
 I think those responsibilities are for the staff positions, and that is how I like to run my organization.
 
 
 15
 I don't want to get involved in hiring and firing at this level. That is the wrong level for us.
 
 
 16
 I think the appropriate thing for us to do is to instruct the Executive Director to take this matter under consideration, to deal with it and get it out of here. That is my judgment.
 
 
 17
 Id. at 17-18. If he doesn't perform, he should be taken out of the organization." Id. at 19. The Board then agreed that "the Executive Director will revise the description and take appropriate action based on that job description." Id. at 20.
 
 
 18
 Apparently nothing was done to revise Mr. Hunt's job description, but in January 1983, at Chairman Mooney's direction, James Gilmartin, the CHA's new personnel director, held a "hearing" over complaints by Michael Davis, a housing manager, that Mr. Hunt had been rude and abusive.[3] Mr. Hunt was not present and was not informed of the hearing, which was attended by Mr. Gilmartin, Davis, Mr. Clark and two other CHA supervisors. At the hearing it was decided not to terminate Mr. Hunt "because of the lack of written documentation supporting the allegations." Plaintiff's Ex. 29 at 2. Mr. Gilmartin recommended that Mr. Hunt's position be eliminated, or that a revised job description be developed, and that thereafter Mr. Hunt's performance should be closely monitored and documented.
 
 
 19
 Soon after, Mr. Clarke recommended that Mr. Hunt be terminated for attending a Board meeting without signing out from work and "while in the pay of the Chicago Housing Authority," in violation of a CHA rule (apparently unwritten) and Mr. Clarke's direct order. At trial, Mr. Clarke could not remember whether Mr. Hunt had ever before attended a Board meeting without signing out or why he had admonished Mr. Hunt not to do so. Mr. Hunt testified that he did sign out before going to the meeting. On February 23rd, after celebrating Harold Washington's victory in the democratic primary for mayor, Mr. Hunt came to work intoxicated, "knocked a little too hard" on the dispatcher's window, and broke it. Def.'s Exs. 16 & 17 (Incident Report of CHA Security Officer). Mr. Clarke and Mr. Gilmartin again recommended that Mr. Hunt be terminated, although at trial Mr. Gilmartin conceded that other CHA employees were not terminated for drunkenness except for multiple instances or a "severe problem in the field." Tr. Vol. 3 at 163-64.
 
 
 20
 On April 22 and April 25, 1983, Mr. Hunt worked late and missed the 4:30 deadline for signing out at the Central Maintenance office. Mr. Hunt testified that on the 22nd, when he realized that he would be late, he called the central office but was not put through to Mr. Clarke. He then went over to the central office, but was not allowed to sign out. On the 26th, Mr. Clarke told Mr. Hunt he was going to dock him for two days pay, and Mr. Hunt stated in response that Mr. Clarke knew he had worked and was a "damn liar." Mr. Clarke then suspended Mr. Hunt without pay. Mr. Hunt sent a written request for a grievance hearing to Mr. Clarke and Mr. Gilmartin. After Mr. Hunt was terminated with the approval of Chairman Mooney and the Executive Director, a hearing was held. A few days later, Mr. Gilmartin notified Mr. Hunt in writing that it had been determined that his "termination was for just cause and in compliance with current CHA policies and procedures." Plaintiff's Ex. 43.
 
 
 21
 The CHA policies and procedures were adopted by the Board of Commissioners in 1978 and printed in a manual entitled "Personnel Procedures." The manual states that "discharges for cause shall be made only after adequate previous warning except in cases of extreme offense," id. at § 2019, and that "[a]n employee may be dismissed for just cause." Id. at § 2621. The manual also states that aggrieved employees have the "right to have any personnel action, condition or situation brought to the attention of administrative officials with a right to appeal to higher levels and to the Executive Director." Id. at § 2461. The purpose of the procedure is to assure just and equitable treatment to employees within the framework of the policies of the Commission." Id. Mr. Hunt testified that he read the CHA personnel procedures manual, including the section on termination for cause before beginning work at the CHA.
 
 
 22
 Mr. Gilmartin, who became the CHA's director of personnel in 1982, testified (after some refreshing of his recollection with his testimony at the earlier trial) that the personnel manuals were "all over the place" and "in every facility in the CHA." Tr. Vol. 2 at 147. He also testified that a purpose of the manuals was to define the rights of the employees, and that employees would telephone or write with questions about the policies.
 
 B. District Court Proceedings
 
 23
 Hunt sued the CHA and individual defendants for terminating his employment in violation of his first amendment rights, procedural due process, and substantive due process. He also alleged breach of contract (the contract being derived from written employment policies) and retaliatory discharge. Three jury trials of Mr. Hunt's claims took place. The first jury rendered a verdict in favor of Mr. Hunt, but the district court granted judgment notwithstanding the verdict in favor of the defendants. This court vacated the judgment n.o.v. and remanded for a new trial. At the second trial, the jury was unable to reach a verdict and a mistrial was declared.
 
 
 24
 A third trial was held. In preliminary proceedings, the court denied the individual defendants' motion for dismissal on grounds of qualified immunity.[4] It also ruled that under Connick v. Myers, 461 U.S. 138, 147 (1983), Mr. Hunt's criticisms of elevator maintenance were speech protected by the First Amendment and that, under Rankin v. McPherson, 483 U.S. 378, 388 (1987), Mr. Hunt's "free speech right far outweigh[ed] any interests the CHA m[ight] have as to efficiency." Tr. Vol. 21 at 731 (Dec. 11, 1989). The parties stipulated that, under state law, the Board of Commissioners of the CHA were policymakers for hiring and firing.
 
 
 25
 The jury found against CHA in favor of Hunt on his First Amendment claim, but found for the individual defendants. On Hunt's procedural and substantive due process claims, the jury found for Hunt against the CHA and individual defendants. On retaliatory discharge and breach of contract, the jury found for the defendants.
 
 
 26
 The district court denied the defendants' motion for a judgment n.o.v. or a new trial. The district court stated that there was sufficient evidence to support the verdict on the First Amendment claim, that the verdicts on the retaliatory discharge and contract claims were not inconsistent with the verdict on the first amendment claim. The district court also stated that there was sufficient evidence to support the verdicts on the procedural and substantive due process claims and to support a finding, which was necessary to those claims, that Mr. Hunt had a property interest in his employment.
 
 II
 ANALYSIS
 
 27
 The appellants appeal the district court's ruling that the individual defendants were not entitled to qualified immunity. They also contend that errors in the instructions to the jury necessitate a new trial, and they appeal the district court's denial of their motion for judgment notwithstanding the verdict or, alternatively, for a new trial.
 
 A. Qualified Immunity
 
 28
 The district court held that the individual defendants' were not entitled to qualified immunity on any of Mr. Hunt's Constitutional claims. Because the jury found that the individual defendants were not liable on Mr. Hunt's First Amendment claims, the issue of qualified of immunity on appeal concerns only the due process claims. The district court denied the individual defendants qualified immunity on the due process claims, stating that "[t]he law has been clear since at least 1972 that an employee with a property interest in his employment is entitled to due process protection." Memorandum Opinion and Order, No. 84 C 3564, at 3-4 (December 12, 1989).[5] The individual defendants appeal the district court's decision on qualified immunity in regard to both Mr. Hunt's procedural due process claim and his substantive due process claim.
 
 
 29
 This court reviews de novo a district court's summary judgment determination regarding qualified immunity. See Upton v. Thompson, 930 F.2d 1209, 1211 (7th Cir.1991), cert. denied, 112 S.Ct. 1262 (1992). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For liability, the "right the official is alleged to have violated must have been 'clearly established' in a 'particularized' way and 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " Upton, 930 F.2d at 1212 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "[I]n order to determine whether the law was clearly established at the time of the defendant's alleged violation, a court cannot look at the legal norm at issue in the abstract." Green v. Carlson, 826 F.2d 647, 649 (7th Cir.1987); see also Warlick v. Cross, Nos. 90-3170 and 90-3802, slip op. at 11 (7th Cir. July 17, 1992). "Rather, the test for qualified immunity is 'whether the law was clear in relation to the specific facts confronting the public official when [he or she] acted." Green, 826 F.2d at 649; Warlick, slip op. at 11. For Mr. Hunt to defeat the defendants' claim of qualified immunity on the due process claims, he must show "that he had a clearly established property interest in continued employment" with the CHA. Hannon v. Turnage, 892 F.2d 653, 656 (7th Cir.), cert. den., 111 S.Ct. 69 (1990).[6] A property interest in employment must spring from a "legitimate claim of entitlement to it" under state law. Board of Regents v. Roth, 408 U.S. 564, 577 (1972). The defendants submit that, if Mr. Hunt had such a right, it was not clearly established under Illinois law at the time of his firing in the spring of 1983. Whether a right is clearly established is also "a purely legal question which requires this court to apply a de novo standard of review." Apostol v. Landau, 957 F.2d 339, 342 (7th Cir.1992). The burden is on the plaintiff to prove that the right in question was clearly established at the time of the alleged violation. Hannon, 892 F.2d at 656.
 
 
 30
 In Duldulao v. St. Mary of Nazareth Hospital Center, 505 N.E.2d 314 (Ill.1987), the Illinois Supreme Court held that "when traditional requirements for contract formation are present, 'an employee handbook or other policy statement creates enforceable contractual rights.' " Mitchell v. Jewel Food Stores, 568 N.E.2d 827, 828 (Ill.1991). Before the 1987 decision in Duldulao, however, cases in the Illinois intermediate appellate courts "trace[d] a wavering line ... on the issue whether an employees' handbook or manual transforms employment at will into employment under contract." Enis v. Continental Illinois Nat'l Bank & Trust Co., 795 F.2d 39, 40 (7th Cir.1986). As the Illinois Supreme Court stated in Duldulao,
 
 
 31
 This court has never specifically addressed the issue of employee handbooks. Our appellate court, however, has addressed the issue several times, with conflicting results. In Carter v. Kaskaskia Community Action Agency (1974), 24 Ill.App.3d 1056, 322 N.E.2d 574, the court held that an employee manual, which was introduced after the employee began working and was written with input from the employees, created enforceable contractual rights. However, in Sargent v. Illinois Institute of Technology (1979), 78 Ill.App.3d 117, 33 Ill Dec. 937, 397 N.E.2d 443, the court distinguished Carter and held that the handbook in question was not binding because it was given to the employee when he first began work and was not specifically "bargained for." (78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443.)
 
 
 32
 Duldulao, 505 N.E.2d at 317. The only federal court to have addressed the issue under Illinois law before 1983 followed Sargent. See Rynar v. Ciba-Geigy Corp., 560 F.Supp. 619 (N.D.Ill.1983). Although, by the time of the Illinois Supreme Court's decision in Duldulao, "the overwhelming majority of courts considering the issue ha[d] held that an employee handbook m[ight], under proper circumstances, be contractually binding," Duldulao, 505 N.E.2d at 317, nearly all of the many cases cited by the Illinois Supreme Court in Duldulao were decided in 1984 or after. See id. Thus, we must conclude that in 1983, at the time of Mr. Hunt's firing, it was not yet clearly established that an employee manual or handbook could create a property interest in employment under Illinois law, particularly in the circumstances present here. The individual defendants were entitled to qualified immunity on Mr. Hunt's due process claims.
 
 B. Jury Instructions
 1. Standard of review
 
 33
 This court's review of jury instructions is limited. See New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474, 1483 (7th Cir.1990). "When reviewing a challenge to a jury instruction, we must view the instruction as a whole and consider the challenged instruction 'both in the context of the other instructions given and in light of the allegations of the complaint, opening and closing arguments and the evidence of record.' " Lynch v. Belden & Co., 882 F.2d 262, 267 (7th Cir.1989) (quoting General Leaseways, Inc. v. National Truck Leasing Ass'n, 830 F.2d 716, 725 (7th Cir.1987)). The instructions "must be construed in a 'common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." General Leaseways, 830 F.2d at 725. Even if a jury instruction is determined to be erroneous, "we will not find reversible error absent some effect on the substantial rights of the parties." Vaughn v. Willis, 853 F.2d 1372, 1376 (quoting General Leaseways, 830 F.2d at 725); see also Bruno v. City of Crown Point, 950 F.2d 355, 360 (7th Cir.1991) (jury verdicts not reversed " '[e]ven if we should discern error in one or more instructions ... unless we are persuaded the jury's understanding of the issue was seriously affected' " to the prejudice of the complaining party) (quoting Wilk v. American Medical Ass'n, 719 F.2d 207, 218-19 (7th Cir.1983), cert. denied, 467 U.S. 1210 (1984)), cert. denied, 112 S.Ct. 2998 (1992). The "burden of showing prejudice rests with the party raising the error at issue," Vaughn, 853 at 1376, and our determination as to prejudice must be based on the record as a whole. Id. at 1377.
 
 
 34
 Under Rule 51 of the Federal Rules of Civil Procedure, "[n]o party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. As this court has stated, "[t]he purpose of the objection is to give the trial court an opportunity to correct any errors it has made. Failure to properly object waives any challenge on appeal." Bob Willow Motors, Inc. v. General Motors Corp., 872 F.2d 788, 794 (7th Cir.1989); see also Gong v. Hirsch, 913 F.2d 1269, 1277 (7th Cir.1990) (no plain error doctrine for civil jury instructions); Deppe v. Tripp, 863 F.2d 1356, 1361 (7th Cir.1988) (same). "Not only must the party object to the jury instruction, its 'objection must be sufficiently detailed to draw the court's attention to the defect [in the jury instruction].' " Sims v. Mulcahy, 902 F.2d 524, 535 (7th Cir.) (quoting Williamson v. Handy Button Mach. Co., 817 F.2d 1290, 1295 (7th Cir.1987)), cert. denied, 111 S.Ct. 249 (1990).
 
 
 35
 2. Instructions on CHA's liability on constitutional claims
 
 
 36
 The jury instructions on Mr. Hunt's three constitutional claims each included a section on the circumstances in which the jury could find the CHA (as opposed to the individual defendants) liable. On the free speech claim, the jury was instructed:
 
 
 37
 In addition to the individuals who are defendants in Hunt's free speech claim, the Chicago Housing Authority is also a defendant. The Chicago Housing Authority, which is also called CHA, is a municipal corporation. Under Illinois law, CHA's board of commissioners is charged with the duty to make CHA's policy as to discharge of employees. To find CHA liable on Hunt's free speech claim, you must find CHA's board responsible for the unlawful conduct.
 
 
 38
 CHA's board need not have put an unlawful policy in writing, however, Rather, you should find CHA liable on Hunt's free speech claim if you find either one, that the board decided to discharge Hunt for his speech, or two, that the board delegated the responsibility to make CHA's discharge policy to one or more other officials at CHA who then discharged Hunt for his speech, or three, that the board approved Hunt's discharge for his speech.
 
 
 39
 If Hunt has merely shown that the CHA board failed to investigate the basis for his discharge, this does not amount to the board delegating its discharge policy, and you should find in favor of CHA on its free speech claim, even though you may find other defendants liable on this claim.
 
 
 40
 However, if Mr. Hunt has shown [that the] CHA board failed to investigate the basis for his discharge after having been given reason to believe that he was being discharged for his speech, you may then find CHA liable.
 
 
 41
 Tr.Vol. 11 at 886. Essentially similar instructions were given with regard to CHA's liability on Hunt's procedural and substantive due process claims.
 
 
 42
 The appellants challenge the instruction quoted above on two grounds: (a) they submit that the final sentence, permitting the jury to find CHA liable "if Mr. Hunt has shown [that the CHA board failed to investigate the basis for his discharge after having been given reason to believe that he was being discharged for his speech," is legally erroneous; and (b) they contend that it was error to submit to the jury the issue whether "the board delegated the responsibility to make CHA's discharge policy to one or more other officials at CHA." According to the appellants, this issue should have been decided by the court.
 
 
 43
 a.
 
 
 44
 The appellants challenge the portion of the instruction regarding liability for failure to investigate on the ground that the instruction "does not require either that the Board approved of Hunt's discharge or that it knew of an allegedly impermissible basis for it." Appellants' Br. at 26. Equating "reason to believe" or "reason to know" with "should know," they contend that this instruction allowed the jury to find CHA liable for "nothing more than negligence," and that " 'merely negligent or even grossly negligent misconduct by state officers is not actionable under section 1983.' " Appellants' Reply Br. at 12 (quoting K.H. v. Morgan, 914 F.2d 846, 852 (7th Cir.1990). Citing St. Louis v. Prapotnik, 485 U.S. 112, 130 (1988), the appellants contend that a plaintiff must prove that "the authorized policymakers approved both the decision and the basis for it." Mr. Hunt argues that, read as a whole, the instruction properly requires the jury to find the CHA liable only if it was "responsible" for an unlawful act. Appellee's Br. at 45-46. He submits that the instruction makes clear that a mere failure to investigate was not sufficient basis for liability; that failure had to be accompanied by knowledge or reason to believe that the discharge violated the Constitution.[7]
 
 
 45
 Any error was clearly not prejudicial. On the First Amendment claim, only the CHA was found liable; the jury found in favor of all the individual defendants. Thus, it is clear that the jury found that the CHA was directly responsible for firing Mr. Hunt in violation of his First Amendment rights. There is no realistic possibility that the jury based the CHA's liability on the theory that the CHA failed to investigate Mr. Hunt's discharge (or on the theories that it merely approved the discharge or that it delegated its policymaking authority to the individual defendants). Moreover, the jury's verdict on the First Amendment claim renders it extremely doubtful that its verdicts against the CHA on Mr. Hunt's procedural and substantive due process claims were based on a theory of derivative liability.
 
 
 46
 b.
 
 
 47
 The same analysis holds with respect to delegation of policymaking authority.[8] Given the jury's determination that CHA was directly responsible for firing Hunt for speech protected by the First Amendment and its exoneration of the individual defendants, it is extremely unlikely that the jury's verdict on the due process claims was based on the theory that the CHA delegated its policymaking authority to Clarke and Gilmartin, who then exercised that authority to discharge Mr. Hunt in violation of his due process rights. The erroneous submission of an issue to the jury does not require reversal or a new trial absent some prejudice caused by the error. See Bob Willow Motors, 872 F.2d at 796; Woods v. Sammisa Co., 873 F.2d 842, 849 (5th Cir.1989) (no new trial required if court is "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it), cert. denied, 493 U.S. 1050 (1990). We are confident that the submission of the issue whether the CHA had delegated its policy-making authority did not affect the verdict.
 
 3. Property interest
 
 48
 The appellants also challenge other portions of the instructions on the substantive and procedural due process claims. On Mr. Hunt's procedural due process claim, the court gave the following instruction to the jury to aid it in determining whether Mr. Hunt had a property interest in continued employment:
 
 
 49
 The 14th Amendment to [the] United States Constitution prohibits any municipal corporation, such as CHA and by extension, any employee of CHA from depriving any person of property without due process of law. Employment can be property within the meaning of this constitutional protection. For instance, if Hunt had an employment contract with CHA that contract is property within the meaning of the constitution.
 
 
 50
 Therefore, if in your deliberations on Hunt's contract claim, you find that the personnel policies in Plaintiff's Exhibit 46 constitute a contract, you should also find that Hunt had a property right in his employment. Even if you do not find that the personnel policies in Plaintiff's 46 are a contract, however, Hunt can still prove that his employment constituted property and, therefore, can recover on his procedural due process claim.
 
 
 51
 If you find that Hunt legitimately and reasonably relied on a promise from CHA that he would only be fired for just cause, you should find that plaintiff had a property right in his employment. To find that Hunt had a property right in his employment it is not necessary that Hunt and CHA reached agreement that he would only be fired for just cause at the same time or in the same conversation. Rather, it is only necessary that Hunt and CHA had a mutual understanding that he would be fired only for just cause. If you find that Hunt did not have a property interest in his employment whether as a contract or as a reasonable reliance on a promise you should find in favor of each of the defendants on the procedural due process claim.
 
 
 52
 Tr. Vol. 11 at 896-67 (February 15, 1990). The court instructed the jury that its finding on whether Mr. Hunt had a property interest in his employment for the procedural due process claim applied as well to Mr. Hunt's substantive due process claim.
 
 
 53
 Whether these instructions are legally correct, however, is an issue we need not decide. As Mr. Hunt points out, the appellants did not specifically object in the district court to the deficiencies they now allege in the instructions on property rights in employment. In the district court, the thrust of the defendants' objection was that it permitted the plaintiff to recover on the basis of "a unilateral expectation" or reliance on a "perceived" requirement that he would be fired only for cause. R.243 at 3. Since the portion of the instruction to which the defendants objected required the jury to find that "Hunt legitimately and reasonably relied on a promise from CHA that he would only be fired for just cause and that "Hunt and CHA had a mutual understanding that he would be fired only for just cause," it is not surprising that the district court denied the defendants' objection. Tr. Vol. 11 at 896 (emphasis supplied).
 
 
 54
 The appellants now assert that it was "flatly inconsistent with Illinois law"[9] (which they properly assert must be the source of any property right) to instruct the jury that Mr. Hunt had a property right in his employment if he "legitimately and reasonably relied on a promise from CHA that he would only be fired for just cause." Appellants' Br. at 34. The appellants submit that "[t]he only conceivable basis under Illinois law for this standard is the theory of promissory estoppel," but that the instruction omits the "well-established" elements necessary to estoppel under Illinois law, namely that "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." Id. (quoting Quake Constr., Inc. v. American Airlines, Inc., 565 N.E.2d 990, 1004 (Ill.1990). Moreover, according to the appellants, because a municipal corporation is a defendant, the plaintiff's reliance must be substantial.
 
 
 55
 The appellants now bring a specific and detailed challenge to the instruction. However, they failed to alert the district court to these defects by "stating distinctly the matter objected to and the grounds of the objection" in the district court, as Rule 51 requires, nor did they propose an instruction incorporating fully the theory they now urge. Therefore, the objection is waived. See Sims, 902 F.2d at 535.
 
 4. Substantive due process
 
 56
 Appellants also challenge the jury instruction on substantive due process. The court instructed the jury:
 
 
 57
 If you found that plaintiff had a property interest in his employment either as a contract or as reasonable reliance on a promise, the due process clause of the 14th Amendment prohibits plaintiff's discharge for reasons that are arbitrary or capricious or for improper motive.
 
 
 58
 If you find that the defendants fired Hunt in violation of his right to free speech or in retaliation for his furtherance of a public policy of Illinois, those would be arbitrary, capricious and improper reasons for termination.
 
 
 59
 Even if you find that Hunt's speech was not the reason for the defendant's [sic] termination of Hunt's employment or that the discharge was not in retaliation for Hunt's furthering of public policy of Illinois, however, you could find a violation of Hunt's substantive due process rights if you find that the defendants were arbitrary or capricious in firing Hunt or they acted in some irrational way.
 
 
 60
 Tr.Vol. 11 at 903. The defendants acknowledge that the first possibility for finding liability (if the defendants fired Mr. Hunt in violation of his right to free speech) was proper. The defendants challenge the second and third possibilities for finding liability (if the defendants fired Mr. Hunt in retaliation for furtherance of Illinois public policy or simply were arbitrary, capricious or irrational in firing Mr. Hunt). It argues that these last alternatives were improper because they permit the jury to find that Mr. Hunt's right to substantive due process was violated by mere deprivation of property without a showing of some other separate constitutional violation or of the inadequacy of state law remedies.
 
 
 61
 This court has acknowledged that a substantive due process claim can be brought in the context of property interests. See New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474, 1480 (7th Cir.1990). However, we have required that, "in addition to alleging that the decision was arbitrary and irrational, 'the plaintiff must also show either a separate constitutional violation or the inadequacy of state law remedies.' " Id. at 1481 (quoting Polenz v. Parrott, 883 F.2d 551, 558 (7th Cir.1989). "In cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that the available state remedies are inadequate, the plaintiff has not stated a substantive due process claim." Kauth v. Hartford Ins. Co., 852 F.2d 951, 958 (7th Cir.1988); accord Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1351 (6th Cir.1992). But see Moore v. Warwick Pub. Sch. Dist., 794 F.2d 322, 329 (8th Cir.1986). The instruction, then, insofar as it permitted the jury to find that defendants had violated Mr. Hunt's substantive due process rights in the absence of an independent constitutional violation or any demonstration that there were no adequate state remedies, was incorrect. Therefore we must determine whether the error was harmful.
 
 
 62
 As we noted above, an error is not harmful absent "some effect on the substantial rights of the parties." Vaughn, 853 F.2d at 1376 (quoting General Leaseways, 830 F.2d at 725). We shall not reverse a jury verdict " '[e]ven if we should discern error in one or more instructions ... unless we are persuaded the jury's understanding of the issue was seriously affected' " to the prejudice of the complaining party. Bruno, 950 F.2d at 360 (quoting Wilk v. American Medical Ass'n, 719 F.2d 207, 218-19 (7th Cir.1983), cert. denied, 467 U.S. 1210 (1984)). Here, given our determination that the individual defendants are shielded by qualified immunity, we need examine only the effect of the instructional error on the CHA. See Bruno, 950 F.2d at 360. As the defendants concede in their brief, because the jury found the CHA liable for a separate constitutional violation--firing Mr. Hunt in violation of the First Amendment--, there can be no harmful effect from this erroneous instruction unless the jury's verdict against the CHA on the First Amendment claim is infirm. The CHA appeals that verdict on the ground that it is not sufficiently supported by the evidence. Because, as will become clear from our analysis below, it is our conclusion that the jury's verdict on Mr. Hunt's First Amendment claim must be upheld, it follows that the instructional error under discussion was harmless.
 
 C. Sufficiency of the Evidence
 1. Standard of review
 
 63
 The CHA appeals the district court's denial of judgment n.o.v., challenging the sufficiency of the evidence on both the First Amendment claim and the due process claims. We review de novo the district court's denial of a motion for judgment notwithstanding the verdict. See Bruno, 950 F.2d at 361; Aungst v. Westinghouse Elec. Corp., 937 F.2d 1216, 1219 (7th Cir.1991). In determining whether the evidence is sufficient to support the verdict, we take the evidence and all reasonable inferences from it in the light most favorable to the party winning the verdict. Bruno, 950 F.2d at 361; Aungst, 937 F.2d at 1219-20. We do not judge the credibility of the witnesses, nor do we weigh the evidence as a fact finder. Collins v. Illinois, 830 F.2d 692, 697 (7th Cir.1987). "Rather, we 'weigh the evidence to the extent of determining whether the evidence to support the verdict is substantial; a mere scintilla of evidence will not suffice.' " Collins, 830 F.2d at 697-98 (quoting La Montagne v. American Convenience Prods., Inc., 750 F.2d 1405, 1410 (7th Cir.1984)).
 
 
 64
 When a jury instruction becomes the law of the case through a party's failure to object properly at trial, the party is precluded from arguing that the jury's verdict was contrary to the appropriate legal standard. Sims, 902 F.2d at 536. As this court has explained:
 
 
 65
 If a party could argue that the evidence was insufficient under the correct legal standard, this would be an indirect method of attacking the instructions.... Once the law of the case is settled by the failure to object to the instructions, the parties may argue only that the jury did not play its proper part. Because the jury's part is to apply the instructions to the facts, we may scrutinize its conclusions only to find out whether it did so.
 
 
 66
 Will v. Comprehensive Accounting Corp., 776 F.2d 665, 675 (7th Cir.1985), cert. denied, 475 U.S. 1129 (1986); see also Rakovich v. Wade, 850 F.2d 1180, 1192 (7th Cir.1988) (en banc ), cert. denied, 488 U.S. 968 (1988).
 
 
 67
 We have examined the record thoroughly in light of these standards and are convinced that, with respect to each claim, the district court was correct in denying the CHA's motion. The evidence, viewed in the light most favorable to Mr. Hunt, was sufficient to support the jury's verdicts both on the First Amendment claim and the due process claims, and, therefore, the district court's denial of judgment notwithstanding the verdict was correct.
 
 
 68
 Alternatively, the appellants submit that the district court erred in denying their motion for a new trial. "The authority to grant a new trial 'is confided almost entirely to the exercise of discretion on the part of the trial court.' " Smith v. Great Am. Restaurants, Inc., Nos. 91-1793 & 91-1864, slip op. at 5 (7th Cir. July 24, 1992). "A district court may grant a new trial 'only where the verdict is against the clear weight of the evidence, and we will reverse the district judge's decision only where there is a clear abuse of discretion.' " Trzcinski v. American Cas. Co., 953 F.2d 307, 315 (7th Cir.1992) (quoting M.T. Bonk Co. v. Milton Bradley Co., 945 F.2d 1404, 1407 (7th Cir.1991)). "We will not set aside a jury verdict if a reasonable basis exists in the record to support the verdict." Id. In the present case, having examined the record in detail, we cannot say that the verdict is against the clear weight of the evidence. The district court did not abuse its discretion by denying the appellants' motion for a new trial.
 
 Conclusion
 
 69
 For the foregoing reasons, the judgment of the district court entered in favor of Mr. Hunt and against the CHA is affirmed. The judgment of the district court denying the individual defendants qualified immunity is reversed.
 
 AFFIRMED IN PART AND REVERSED IN PART
 
 
 [1]
 Another defendant, Winston Moore, who was sued only on the First Amendment claim, received a favorable verdict and is not a party to this appeal
 
 
 [2]
 Mr. Hunt's charges were not without foundation; the serious inadequacies of CHA management and abuses by the Westinghouse repairmen are discussed in detail in a report prepared by HUD. See Plaintiff's Ex. 11 (Review and Analysis of the Chicago Housing Authority and Implementation of Recommended Changes, Chapter 12, "Elevator Maintenance" (March 31, 1982))
 
 
 [3]
 The minutes of the hearing indicate that Davis complained that Mr. Hunt had accused him in the presence of others of being incompetent and of stealing from the CHA. Davis later was terminated for practicing law at a local courthouse while he was supposed to be on the job at the CHA. See Plaintiff's Ex. 55
 
 
 [4]
 No interlocutory appeal was taken from the district court's ruling on qualified immunity, although such an appeal was of course possible. See Juriss v. McGowan, 957 F.2d 345, 346 (7th Cir.1992)
 
 
 [5]
 The district court's order and opinion stated that the defendants failed to raise the issue of qualified immunity for the substantive due process claims in its trial brief. The court ruled that the defendants had waived qualified immunity on that claim or, alternatively, that they were not entitled to qualified immunity. On appeal, appellants address the issue of qualified immunity for the substantive due process claim on the merits. They do not raise any challenge to the district court's finding that they waived the issue. However, while it is true that, in their brief to the district court on qualified immunity the defendants raised no distinct arguments specifically directed to substantive due process, their argument that Mr. Hunt had no property interest in his job was directed toward the "due process claims" (plural). Supplemental R.7. In his appellate brief, Mr. Hunt makes no mention the district court's finding of waiver on the issue of substantive due process
 
 
 [6]
 See also Spuler v. Pickar, 958 F.2d 103, 108 (5th Cir.1992):
 To succeed in his challenge to the defendants' qualified immunity, Spuler must show that at the time the University determined to terminate his contract, a reasonable university official would have known that termination under like circumstances would have violated Spuler's due process rights. In sum, Spuler would have to show that a non-tenured professor had a clearly-established, constitutionally-protected interest in continued University employment, and that denying him tenure for financial reasons was arbitrary and capricious.
 
 
 [7]
 Although the terms "reason to believe" or "reason to know" are occasionally used interchangeably with "should know" or should have known," the terms are not synonymous. "The words 'reason to know' ... denote the fact that the actor has information from which a person of reasonable intelligence ... would infer that the fact in question exists" while "[t]he words 'should know' ... denote the fact that a person of reasonable prudence and intelligence ... would ascertain the fact in question in the performance of his duty to another." Restatement of Torts (Second) § 12 (1965) (emphasis added). The Restatement explains the difference:
 Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.
 Id. at § 12 cmt. a.
 
 
 [8]
 The Supreme Court has made it clear that the identity of those officials to whom state law has delegated policymaking authority is an issue for the court, not for the jury. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) ("[W]hether a particular official has 'final policymaking authority' is a question of state law. As with other question of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury."). In the present case, the district court properly decided that issue. It is somewhat less clear if the court must also decide whether an official possessing policymaking authority under state law has delegated that authority to another official. However, the Eleventh Circuit has stated that this also is an issue to be decided by the trial court before the case is submitted to the jury. See Mandel v. Doe, 888 F.2d 783, 792 (11th Cir.1989)
 Mr. Hunt asserts that the defendants waived this objection because they failed to include it in their written objections to the plaintiff's proposed instructions and only objected to it orally in conference before the district court (at which time, he further suggests, they misled the court into believing they had included the objection in their written objections). However, as the defendants point out, because Mr. Hunt did not object to this procedure below, he has waived waiver.
 
 
 [9]
 It is not clear under what circumstances a "mutually explicit understanding," see Perry v. Sindermann, 408 U.S. 593, 601 (1972), could give rise to a property interest in employment under Illinois law. See Hohmeier v. Leyden Community High Sch. Dist. 212, 954 F.2d 461, 465 n. 2 (7th Cir.1992); Lee v. County of Cook, 862 F.2d 139, 142-43 (7th Cir.1988); Leahy v. Board of Trustees of Community College Dist. No. 508, 912 F.2d 917, 922 n. 7 (7th Cir.1990). However, we stated in Hohmeier that nothing in the caselaw "suggests that Duldulao provides the only way for a public employee to establish a property interest in his or her job." Hohmeier, 954 F.2d at 465